**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

GREG MANTIA, Derivatively On Behalf Of BED BATH & BEYOND INC.,

Plaintiff,

v.

JOHN E. FLEMING, SUE E. GOVE, JEFFREY A. KIRWAN, ANN YERGER, MARK J. TRITTON, MARY A. WINSTON, ROBYN M. D'ELIA, STEPHANIE BELLROSE, HARRIET EDELMAN, PATRICK R. GASTON, JOHNATHAN B. OSBORNE, HARSHA RAMALINGAM, VIRGINIA P. RUESTERHOLZ, JOSHUA E. SCHECHTER, AND ANDREA WEISS,

Defendants,

and,

BED BATH & BEYOND INC.,

Nominal Defendant.

Case No.:

**SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Greg Mantia ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Bed Bath & Beyond, Inc. ("Bed Bath" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) of the Exchange Act.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). Further, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Bed Bath is a New York corporation with principal executive offices located at 650 Liberty Avenue, Union, New Jersey 07803.

## THE PARTIES

### Plaintiff

6. ***Plaintiff Greg Mantia*** ("Mantia") is, and was at relevant times, a shareholder of Bed Bath & Beyond. Plaintiff Mantia holds Bed Bath shares during the relevant period. Plaintiff Mantia

will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Defendant Mantia is a citizen of Oklahoma.

**Nominal Defendant**

7. Nominal Defendant Bed Bath is incorporated under the laws of New York with its principal executive offices located at 650 Liberty Avenue, Union, New Jersey 07803. Nominal Defendant Bed Bath is a citizen of New York and New Jersey.

**Director Defendants**

8. ***Defendant John E. Fleming*** ("Fleming") has served as Director since May 29, 2019. Upon information and belief, Defendant Fleming is a citizen of the Commonwealth of Pennsylvania.

9. ***Defendant Sue E. Gove*** ("Gove") has served as a Director since May 29, 2019. Upon information and belief, Defendant Gove is a citizen of Texas.

10. ***Defendant Jeffrey A. Kirwan*** ("Kirwan") has served as Director since May 29, 2019. Upon information and belief, Defendant Kirwan is a citizen of New York.

11. ***Defendant Ann Yerger*** ("Yerger") has served as a Director since May 2019. Upon information and belief, Defendant Yerger is a citizen of the District of Columbia.

12. ***Defendant Mark J. Tritton*** ("Tritton") has served as the Company's Chief Executive Officer ("CEO") and, in that capacity, as a Director since November 2019. Upon information and belief, Defendant Tritton is a citizen of Australia.

13. ***Defendant Mary A. Winston*** ("Winston") served as the Company's Interim CEO from May 2019 until November 4, 2019, and after that time remained as a Director. Upon information and belief, Defendant Winston is a citizen of North Carolina.

14. ***Defendant Robyn M. D'Elia*** ("D'Elia") served as the Company's Chief Financial Officer ("CFO") at all relevant times. She was appointed as the Company's CFO in June 2018 and

resigned on May 4, 2020. In connection with her promotion, the Company entered into an employment agreement with D'Elia which provides for severance pay equal to one year's salary if the Company terminates Ms. D'Elia's employment other than for "cause." Upon information and belief, Defendant D'Elia is a citizen of New Jersey.

15. ***Defendant Stephanie Bell-Rose*** ("Bell-Rose") was elected to the position of Director in May 2018. She currently serves on the Nominating and Corporate Governance Committee. Upon information and belief, Defendant Bell-Rose is a citizen of New York.

16. ***Defendant Harriet Edelman*** ("Edelman") has served as a Director since May 2019. Defendant Edelman was originally recommended for appointment by the Nominating and Corporate Governance Committee. Defendant Edelman was Chair of the Audit Committee and a member of the Compensation Committee. She stepped down from those roles on or about May 29, 2020, in connection with her appointment to serve as independent Chair of the Board for the Company, replacing Defendant Gaston (defined below). Upon information and belief, Defendant Edelman is a citizen of Connecticut.

17. ***Defendant Patrick R. Gaston*** ("Gaston") served as a Director from 2007 to May 29, 2020. Defendant Gaston also served as Chairman of the Board from April 2019 until May 29, 2020. Defendant Gaston served on the Nominating and Corporate Governance Committee, which appointed Edelman and four other defendants as Directors. Upon information and belief, Defendant Gaston is a citizen of the District of Columbia.

18. ***Defendant Joshua E. Schechter*** ("Schechter") has served as a director since May 29, 2019. Defendant Schechter was a member of the Audit Committee. He has since been appointed Chair of the Audit Committee. Upon information and belief, Defendant Schechter is a citizen of California.

19. ***Defendant Johnathan B. Osborne*** ("Osborne") has served as a Director since 2018. Defendant Osborne is a member of the Audit Committee. Upon information and belief, Defendant Osborne is a citizen of New York.

20. ***Defendant Virginia P. Ruesterholz*** ("Ruesterholz") has served as a Director since 2017. Defendant Ruesterholz is a member of the Audit Committee. Upon information and belief, Defendant Ruesterholz is a citizen of New Jersey.

21. ***Defendant Andrea Weiss*** ("Weiss") has served as Director since May 1, 2019. Defendant Weiss is a member of the Audit Committee. Upon information and belief, Defendant Weiss is a citizen of Florida.

22. ***Defendant Harsha Ramalingam*** ("Ramalingam") has serve as Director since May 1, 2019. Upon information and belief, Defendant Ramalingam is a citizen of the State of Washington.

23. Defendants Fleming, Gove, Kirwan, Yerger, Tritton, Winston, D'Elia, Bell-Rose, Edelman, Gaston, Schechter, Osborne, Ruesterholz, Weiss, and Ramalingam are collectively referred to as the "Defendants."

24. Defendants Edelman, Osborne, Ruesterholz, Schechter, and Weiss are collectively referred to as the "Audit Committee Defendants."

**DUTIES OF DEFENDANTS**

25. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

26. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

27. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(d) ensure that the Company was operated in a diligent, honest, and prudent

manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(e) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

28. Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## CHARTER OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS

29. The Company's Audit Committee Charter states in relevant part:

**I. Statement of Policy**

The purpose of the Audit Committee (the "Committee") is to oversee the Corporation's accounting and financial reporting processes and the audit of the Corporation's financial statements. The Committee will also advise and assist the Board of Directors (the "Board") of the Corporation in fulfilling its oversight responsibilities with respect to the following, in addition to other duties related to its mission:

- the integrity of the Corporation's quarterly and annual financial statements and financial reporting processes;
- the Corporation's earnings announcements, as well as financial information and earnings guidance provided to analysts and ratings agencies;
- audits of the Corporation's financial statements;
- the company's internal control system and the quality of internal control by management;
- management's practices to ensure adequate risk management and business continuity

- compliance with legal and regulatory requirements and the Corporation's ethical conduct policy;
- the independent auditor's qualifications, independence and performance
- the performance of the Corporation's internal audit function, cyber-security, data privacy, information technology, and information protection; and
- procedures for receipt and treatment of complaints received by the Company from its customers, vendors or employees relating to accounting, internal accounting controls or auditing matters.

While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct the audits or to determine that the Corporation's financial statements are complete, accurate and in accordance with generally accepted accounting standards. This is the responsibility of management and the Corporation's outside auditor.

* * *

**IV. Responsibilities and Duties**

The Committee shall have the following responsibilities, authority and duties in addition to other responsibility directly related to these matters or otherwise to achievement of its mission:

1. The Committee shall oversee the Corporation's accounting and financial reporting processes and the audits of the Corporation's financial statements.

2. The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged (including resolution of disagreements between management and the Corporation's outside auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation. Each such registered public accounting firm shall report directly to the Committee. The Corporation shall provide for appropriate funding, as determined by the Committee, for payment of:

    (a) compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation;

    (b) compensation to any advisers employed by the Committee; and

    (c) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

3. The Committee shall, to the extent required by any applicable legal or regulatory requirement, pre-approve all auditing services and permitted non-audit services that may be provided to the Corporation by its outside auditor, and establish policies and procedures for the Committee's pre-approval of such services on an on-going basis. The Committee delegates authority to the Audit Committee Chairman or member of the Committee if delegated by the Chairman to approve services on behalf of the Committee, not to exceed $50,000.00 for non-audit services and $200,000.00 for tax services. Such approval will be reported to the full Committee at the next meeting.

4. At least annually, the Committee shall receive from its outside auditor a formal written statement delineating all relationships between the auditor and the Corporation, consistent with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB") regarding the outside auditor's communications with the Committee concerning independence, actively engage in a dialogue with the auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the auditor, and take, or recommend that the full Board take, appropriate action to oversee the independence of the outside auditor.

5. Review with management and the outside auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including analyses of critical accounting policies and analyses of the effects of alternative GAAP methods on the financial statements.

6. The Committee shall review the Corporation's annual audited financial statements, including any certification, report or opinion rendered by the Corporation's outside auditor, and discuss the same with management and the auditor. The Committee shall recommend to the Board whether the annual financial statements should be included in the Corporation's Annual Report on Form 10-K.

7. The Committee shall review and discuss with the Company's outside auditors and management the Company's quarterly financial statements and review and discuss the Company's quarterly reports on Form 10-Q and annual reports on Form 10-K before such reports are filed with the Securities Exchange Commission (the "SEC"), including the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

8. The Committee shall oversee, and review and discuss with the outside auditors, the functions of the Corporation's internal audit department, including its purpose, organization, responsibilities, budget and staffing; review the internal audit plan, including the results of internal audits; and ensure that significant findings and recommendations made by the internal

auditors are discussed and resolved on a timely basis. The internal audit department will report directly to the Committee, and oversee organizational structure, staffing and activities, approve the annual audit plan, scope and budget, and oversee the quality assurance and improvement program in accordance with applicable standards. The Chief Financial Officer shall provide administrative support, as necessary, to the internal auditor.

9. The Committee shall discuss with the outside auditor the matters described in PCAOB Auditing Standards No. 1301, Communications with Audit Committees, including, without limitation, the auditors' evaluation of the quality of the Corporation's financial reporting, information relating to significant unusual transactions and the business rationale for such transactions, and other applicable requirements of the PCAOB and the SEC.

10. The Committee shall review with management the Corporation's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the outside auditors' report on the effectiveness of the Corporation's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

11. The Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

12. The Committee shall review and approve all related-party transactions (as defined in Item 404 of Regulation S-K of the SEC) that are brought to the Committee's attention.

13. The Committee shall have the power to conduct or authorize investigations into any matters within the Committee's scope of responsibilities.

14. The Committee shall have the authority to engage independent counsel and other advisors, as the Committee determines necessary to carry out its duties and responsibilities.

15. The Committee may consider such other matters in relation to the financial affairs of the Corporation and its accounts, and in relation to the internal and external audits of the Corporation, as the Committee may, in its discretion, determine to be advisable.

16. The Committee shall annually report to the Corporation's shareholders on certain auditing matters, as required by the rules and regulations of the SEC,

as they may be amended from time to time. Such report will be included in the Corporation's annual proxy statement.

17. To the extent permitted by law or applicable policies and rules of the Corporation, the Committee may form subcommittees and delegate authority to any such subcommittee or to any designated officer of the Corporation as it deems appropriate.

18. The Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for its approval.

## COMPANY OVERVIEW

### Background

30. The Company is a retailer that sells a wide variety of domestic merchandise and home furnishings. The Company operates under many brand names including Christmas Tree Shops, Harmon, buybuy BABY, and Cost Plus World Market.

## FALSE AND MISLEADING STATEMENTS

31. On October 2, 2019, Defendants caused the Company to announce its second quarter 2019 financial results in a press release:

> For the fiscal 2019 second quarter, the Company reported a net loss of $(1.12) per diluted share ($(138.8) million), which included an unfavorable impact of approximately $1.46 per diluted share from charges related to the first wave of transformation initiatives including, severance costs associated with the corporate workforce reduction and decision to outsource certain functions, and an inventory write down. . . . Net sales for the fiscal 2019 second quarter were approximately $2.7 billion, a decrease of approximately 7.3% compared to the prior year period. Comparable sales in the fiscal 2019 second quarter declined approximately 6.7%.
>
> * * *
>
> **Fiscal 2019 Updated Financial Outlook**
>
> Fiscal 2019 full-year results continue to be in line with the Company's most recent guidance and assumes current investment plans to drive top-line performance in the back half, as well as its comp sales trends year to date, and excludes goodwill and other impairments, severance costs, shareholder activity costs, the inventory write down, and any incremental impact from tariffs. Fiscal

> 2019 full-year net sales are estimated to be around $11.4 billion and net earnings per diluted share are estimated to be between $2.08 and $2.13.

32. During a conference call held the same day to discuss these results, Defendant Winston reported that "[t]o further drive holiday sales, we are adding marketing and promotional support for Bed Bath & Beyond in the back half of the year." Moreover, regarding the inventory write-down disclosed in the press release, Defendant Winston reported:

> As we mentioned in the recent shareholder letter, we have plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months. As a result of the decision, we took $194 million inventory write-down in the second quarter.
>
> We believe this aggressive disposition of inventory will enable us to more quickly reset inventory levels in both our Bed Bath & Beyond stores and distribution centers to allow for a faster refresh of our assortment, as well as to enable us to refocus store labor activity to better support our customers and drive sales. In the short term, more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season. This will be accomplished through a series of markdowns and clearance events, as well as with the assistance of the independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales.

33. On October 9, 2019, the Company filed its quarterly report for the period ended August 31, 2019, affirming the previously reported financial results. Regarding inventory levels, the quarterly report stated:

> Retail inventory, which includes inventory in the Company's distribution facilities for direct to customer shipments, was approximately $2.3 billion at August 31, 2019 decrease of 17.8% compared to retail inventory at September 1, 2018. The Company continues to focus on its inventory optimization strategies.

34. In the same quarterly report, the Company stated that its CEO and CFO had "concluded that the Company's current disclosure controls and procedures are effective."

35. The above statements above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Defendants failed to disclose to investors: (a) that, due to "aggressive disposition of inventory," the Company lacked sufficient inventory in key categories to support holiday sales; (b) that the

Company's internal control over inventory levels and financial reporting was not effective; (c) that, as a result of the foregoing, the Company was likely to experience reduced sales; and (d) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

## THE TRUTH STARTS TO EMERGE

36. On January 8, 2020, the Company withdrew its fiscal 2019 guidance. In a Company press release announcing its third quarter 2019 financial results and withdrawing its fiscal 2019 guidance, the Company stated:

> **Fiscal 2019 Third Quarter Results**
>
> For the fiscal 2019 third quarter, the Company reported a net loss of $(0.31) per diluted share ($(38.6) million), which included a net benefit of $0.07 from the favorable impact from an adjustment to the incremental inventory reserve for future markdowns associated with its inventory initiative, that was partially offset by a non-cash charge for the impairment of certain store-level assets. This compares to net earnings of $0.18 per diluted share ($24.4 million) for the fiscal 2018 third quarter, which included the favorable impact of $0.16 per diluted share from the gain on the sale of a building. Excluding these net favorable impacts in both periods, the Company reported an adjusted net loss of $(0.38) per diluted share ($(46.9) million) for the fiscal 2019 third quarter, compared to adjusted net earnings of $0.02 per diluted share ($2.7 million) for the fiscal 2018 third quarter. Net sales for the fiscal 2019 third quarter were $2.8 billion, a decrease of 9.0% compared to the prior year period. Comparable sales in the fiscal 2019 third quarter declined 8.3%.
>
> The Company's fiscal 2019 third quarter was significantly impacted by the calendar shift of the Thanksgiving holiday this year resulting in one less week of holiday sales compared to the prior year period. Adjusting for this calendar shift to include Thanksgiving and Cyber Monday weeks in both periods, comparable sales for the fiscal 2019 third quarter declined 3.6%. During the key five-day shopping period from Thanksgiving to Cyber Monday for both this year and last year, comparable sales on a shifted basis increased 7.1%.
>
> * * *
>
> **Outlook**
>
> The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter. Considering these headwinds reflected in the Company's results

> to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month, the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance.

37. On this news, the Company's share price fell $3.20, or over 19%, to close at $13.4 per share on January 9, 2020, on unusually heavy trading volume.

38. On January 9, 2020, the Company filed its quarterly report on Form 10-Q for the period ended November 30, 2019, affirming the previously reported financial results. Regarding inventory levels, the Company stated:

> Retail inventory, which includes inventory in the Company's distribution facilities for direct to customer shipments, was approximately $2.5 billion at November 30, 2019, a decrease of 15.6% compared to retail inventory at December 1, 2018. The Company continues to focus on its inventory optimization strategies.

39. In the same report, the Company stated that its CEO and CFO had "concluded that the Company's current disclosure controls and procedures are effective."

40. The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Defendants failed to disclose to investors: (a) that, due to "aggressive disposition of inventory," the Company lacked sufficient inventory in key categories to support holiday sales; (b) that the Company's internal control over inventory levels and financial reporting was not effective; (c) that, as a result of the foregoing, the Company was likely to experience reduced sales; and (d) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

## FURTHER DISCLOSURES

41. On February 11, 2020, the Company issued a press release reporting preliminary fourth-quarter 2019 financial results. Therein, the Company disclosed "a 5.4% decline in

comparable sales driven primarily by store traffic declines combined with inventory management issues," including that "inventory within certain key categories in the Bed Bath & Beyond assortment was too low or out-of-stock during the period." The Company reported:

> Bed Bath & Beyond Inc. (Nasdaq: BBBY) today reported preliminary, unaudited financial performance data for the first two months of the fiscal 2019 fourth quarter (December 2019 and January 2020), including ***a 5.4% decline in comparable sales driven primarily by store traffic declines combined with inventory management issues, and increased promotional activity and markdowns***. The Company is providing this update today to provide visibility into the current pressures on the business, which the Company's new management has been reviewing to ascertain insights and key learnings.
>
> Mark J. Tritton, President and CEO of Bed Bath & Beyond, said, "We are experiencing short-term pain in our efforts to stabilize the business, including the pressures of store traffic trends ***coupled with our own executional challenges***. However, we did achieve a notable positive shift in sales in our digital channels during this period, with growth of approximately 20%. I believe we can solidify this growth, while also addressing the broader stabilization of our business."
>
> * * *
>
> <u>Fiscal December 2019/January 2020 Comparable Sales</u>
>
> For the first two months of the fiscal 2019 fourth quarter (December 2019 and January 2020), the Company's comparable sales declined 5.4%, reflecting a low-double-digit percentage decrease in transactions in stores, partially offset by a mid-single-digit percentage increase in the average transaction amount. On a directional basis, comparable sales from stores declined nearly 11%, while comparable sales from digital channels grew approximately 20%.
>
> Comparable sales include the shift of the Cyber Monday holiday week, which is in the Company's fiscal fourth quarter this year versus the fiscal third quarter of last year. Adjusting for the calendar shift to exclude Cyber Monday week in both periods, comparable sales for the first two months of the fiscal 2019 fourth quarter declined 13%.
>
> ***Product availability leading into the holiday period was also a contributing factor, as inventory within certain key categories in the Bed Bath & Beyond assortment was too low or out-of-stock during the period.*** The Company is immediately reforming its internal planning and inventory management procedures to master the fundamentals. (Emphases added.)

42. On this news, the Company's share price fell $3.06 per share, or over 20%, to close at $11.79 per share on February 12, 2020, on unusually heavy trading volume.

**THE COMPANY REPURCHASES COMPANY SHARES AT INFLATED PRICES**

43. Since 2004 through the end of fiscal 2019, the Company has repurchased approximately $10.7 billion of its common stock through share repurchase programs. The Company's purchases of its common stock during the fourth quarter of fiscal 2019 were as follows:

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share (2) | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (1) | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs (1) (2) |
|---|---|---|---|---|
| December 1, 2019 - December 28, 2019 | 30,900 | $ 15.45 | 30,900 | $ 1,236,668,444 |
| December 29, 2019 - January 25, 2020 | 2,600 | $ 12.80 | 2,600 | $ 1,236,635,172 |
| January 26, 2020 - February 29, 2020 | 5,400 | $ 12.34 | 5,400 | $ 1,236,568,539 |
| Total | 38,900 | $ 14.84 | 38,900 | $ 1,236,568,539 |

**IN REPURCHASING STOCK, THE COMPANY RELIED ON THE FALSE OR MISLEADING STATEMENTS**

44. In repurchasing common stock, the Company relied on Defendants false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

45. The Company justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public. The Company would not have purchased its securities at artificially inflated prices had Defendants disclosed all material information known to them or that

was so obvious it should have been known to them, as detailed herein. Thus, reliance by the Company should be presumed with respect to Defendants omissions of material information as established by the *Affiliated Ute* presumption of reliance.

46. Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material facts or failures to disclose material facts.

47. At all relevant times, the market for the Company stock was efficient market for the following reasons, among others:

(a) The Company stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ;

(c) The Company's common-stock trading value was substantial on a daily basis, exceeding millions of shares per day;

(d) The Company regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) The Company was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

(f) The market price of the Company's stock reacted rapidly to new information entering the market.

48. As a result of the foregoing, the market for the Company stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock. The foregoing facts indicate the existence of an efficient market for trading of the Company's stock and support application of the fraud-on-the-market doctrine.

49. The Company relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Defendants' misstatements and omissions alleged herein.

50. Had the Company known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, the Company would not have purchased the Company stock at artificially inflated prices.

**NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE MISREPRESENTATIONS**

51. Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

52. Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially

from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of the Company who knew that the statement was materially false or misleading when made. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

53. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the breaches of fiduciary duty and other violations of law by Defendants.

54. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

55. When this action was commenced, the Board consisted of the following eight (15) directors: Defendants Fleming, Gove, Kirwan, Yerger, Tritton, Winston, D'Elia, Bell-Rose, Edelman, Gaston, Schechter, Osborne, Ruesterholz, Weiss, and Ramalingam. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

**Defendant Tritton**

56. The principal professional occupation of Defendant Tritton is his employment with the Company as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Defendant Tritton received approximately $14,435,000 in compensation from the Company during fiscal 2019. Additionally, Tritton is a named defendant in the securities class action entitled *Vitiello v. Bed Bath & Beyond, Inc., et al.*, Case 2:20-cv-04240 (D. N.J.) ("Securities Class Action").

**Defendant Winston**

57. Defendant Winston has been a Company director and officer since May 2019, when she was appointed Interim CEO. Since stepping down from that role in November 2019, Defendant Winston has been a director. Defendant Winston received $1,899,995 worth of stock in compensation from the Company during fiscal 2019 in relation to her tenure as interim CEO and has received and continues to receive compensation for her role as a director. Additionally, Defendant Winston is a named defendant in the Securities Class Action.

**Defendants Edelman, Osborne, Ruesterholz, Schechter, and Weiss**

58. The Audit Committee Defendants (Edelman, Osborne, Ruesterholz, Schechter, and Weiss) each face a substantial likelihood of liability for their failure to take steps to ensure the Company's regulatory compliance. The Audit Committee Charter specifically charges the members of the Audit Committee with ensuring the Company's compliance with legal and regulatory requirements, and the Audit Committee Defendants violated their duties of loyalty and good faith by failing to take adequate steps to ensure such compliance.

**Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston, and Yerger**

59. Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston, and Yerger were directors at the time of the stock

repurchases and voted to conduct the stock repurchase. These defendants caused the Company to be harmed by over $250,000. They could not disinterestedly consider a demand for action or investigate their votes without being required to evaluate and make a decision on such topics as their states of mind, whether there was a reason to doubt they acted with business judgement.

**FIRST CAUSE OF ACTION**

**(Against Defendants For Breach Of Fiduciary Duties)**

60. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

61. Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

62. Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

63. Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials and internal controls. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

64. As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

65. As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.

Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**(Against Defendants For Waste Of Corporate Assets)**

66. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

67. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

68. As a result of the misconduct described above, Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

69. As a result of the waste of corporate assets, Defendants are liable to the Company.

70. Plaintiff, on behalf of the Company, has no adequate remedy at law.

**THIRD CAUSE OF ACTION**

**(Against Defendants For Unjust Enrichment)**

71. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company. Defendants were unjustly enriched as a result of

the compensation and director remuneration they received while breaching fiduciary duties owed to the Company.

73. Plaintiff, as a stockholder and representative of the Company, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

74. Plaintiff, on behalf of the Company, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**(Against Defendants Tritton, Winston and D'Elia For Violations Of Section 10(b) Of The Exchange Act And 21D of the Exchange Act)**

75. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76. Defendants Tritton, Winston, and D'Elia are named as defendants in the related Securities Class Action. The conduct of these Defendants has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

77. The Company is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

78. Defendants Tritton, Winston and D'Elia had the power or ability to, and did, control or influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

79. Defendants Tritton, Winston and D'Elia are liable under § 21D of the Exchange Act.

80. Defendants Tritton, Winston and D'Elia have damaged the Company and are liable to the Company for contribution.

81. No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## FIFTH CAUSE OF ACTION

**(Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston, and Yerger)**

82. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83. Defendants disseminated or approved public statements that failed to disclose that: (a) due to "aggressive disposition of inventory," the Company lacked sufficient inventory in key categories to support holiday sales; (b) the Company's internal control over inventory levels and financial reporting was not effective; (c) as a result of the foregoing, the Company was likely to experience reduced sales; and (d) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis. Despite this artificial inflation in the price of the Company's shares, Defendants caused and/or allowed the Company to repurchase shares of Company stock, thereby causing financial harm to the Company.

84. As alleged herein, Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston and Yerger acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston and Yerger, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company participated in the fraudulent scheme alleged herein.

85. Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston and Yerger knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.

86. Based on their roles at the Company, each of these Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

87. At a minimum, Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston and Yerger failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at the Company, Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne,

Ramalingam, Ruesterholz, Schechter, Weiss, Winston and Yerger knew and/or recklessly disregarded the extent and scope of their statements.

88. Likewise, Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston and Yerger, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. These Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

89. As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance

obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable

Dated: July 31, 2020

**GAINEY McKENNA & EGLESTON**

By: */s/ Barry Gainey*________________
Barry Gainey (BJG 7560)
375 Abbott Road
Paramus, NJ 07652
Telephone: (201) 225-9001
Facsimile: (201) 225-9002
Email: bgainey@gme-law.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGESTON**
501 Fifth Avenue, 19th Floor
New York, New York 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-aw.com

***Counsel for Plaintiff***

**VERIFICATION**

I, GREG MANTIA, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Bed Bath & Beyond and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Bed Bath & Beyond common stock at all relevant times.

GREG MANTIA